UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| PRESIDENT CASINOS, INC., | ) | Case No. 02-53005-659 |
| | ) | Judge Kathy A. Surratt-States |
| | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | |
| PRESIDENT CASINOS, INC., ET. AL. | ) | **Adversary No. 06-4036-659** |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -v- | ) | |
| | ) | |
| COLUMBIA SUSSEX CORPORATION, and | ) | |
| WIMAR TAHOE CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The matter before the Court is Motion for Summary Judgment Filed by Plaintiffs, Debtors' Statement of Undisputed Facts, Memorandum in Support of Debtors' Motion for Summary Judgment, Defendants' Motion for Summary Judgment, Defendants Columbia Sussex Corporation and Wimar Tahoe Corporations' Statement of Uncontroverted Material Facts, Defendants' Memorandum in Support of Motion for Summary Judgment, Debtors' Response to Defendants' Statement of Uncontroverted Material Facts, Debtors' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, Memorandum of Law in Opposition Filed by Defendants, Response Filed by Defendants to Statement of Undisputed Facts, Reply Memorandum in Support Filed by Plaintiffs, Reply Memorandum Filed by Defendants and Supplemental Statement of Undisputed Facts Filed by Plaintiffs.  A hearing on this matter was held on May 15, 2007, whereby both Debtors and Defendants appeared by counsel.  Upon consideration of record as whole, the Court issues the following **FINDINGS OF FACT**:

President Casinos, Inc. (hereinafter "PCI") filed a voluntary petition for reorganization under

Chapter 11 on June 20, 2002.  PCI continued to operate its business and manage its financial affairs as a debtor in possession.  President Riverboat Casino—Missouri, Inc. (hereinafter "PRC-MO") is a wholly owned subsidiary of PCI.  PRC-MO also filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code on June 20, 2002.  PRC-MO owned and operated a riverboat gaming casino aboard the Admiral on Laclede's Landing in St. Louis, Missouri (hereinafter the "Admiral Casino").

On or about September 30, 2004, PCI entered into a Riverboat Casino Sale and Purchase Agreement (hereinafter "Purchase Agreement") with Columbia Sussex. Debtors' Statement of Undisputed Facts, p. 4, ¶ 12; Defendants' Statement of Uncontroverted Material Facts, p. 3, ¶ 9.  Pursuant to the Purchase Agreement, Columbia Sussex was to purchase all of the stock of PRC-MO from PCI, in a transaction to be closed no later than August 1, 2005, if Columbia Sussex submitted the winning bid at the Auction.  Columbia Sussex did submit the winning bid in the amount of $57,000,000.00.  Debtors' Statement of Undisputed Facts, p. 5, ¶ 14; Defendants' Statement of Uncontroverted Material Facts, p. 4, ¶ 16.  After several amendments to the Purchase Agreement to extend the closing date, a final closing date of October 30, 2005 was set.  Columbia Sussex paid additional consideration of $2,000,000.00 and increased the $1,000,000.00 escrow deposit by $500,000.00 in exchange for the extension of the closing date.  Debtors' Statement of Undisputed Facts, p. 5, ¶ 16; Defendants' Statement of Uncontroverted Material Facts, p. 5, ¶ 20.

The Purchase Agreement provided that Columbia Sussex would purchase PRC-MO stock on the condition that Missouri Gaming Commission (hereinafter "MGC") issue licenses, permits, approvals, consents, authorizations and orders as required to acquire closing shares and operate casino following the closing under the laws and regulations of Missouri, including gaming license and liquor license**.**  Defendants' Ex. 2, ¶  4(j); Plaintiffs' Ex. 9, ¶  4(j).

Further, the Purchase Agreement required that Columbia Sussex use all commercially reasonable efforts to cause those conditions to the closing, which are reasonably within its control

to be timely satisfied. Columbia Sussex agreed to file the gaming license application within 30 business days after issuance of the order approving the sale to obtain MGC approval to operate a casino and make available to PCI copies of all materials together with evidence of filing. Columbia Sussex agreed to use all commercially reasonable efforts to comply with all requests of MGC to obtain MGC approval and further agreed not to take any action that could reasonably be expected to impede or delay the issuance of MGC approval or result in the refusal of MGC approval. Defendants' Ex. 2, ¶ 10; Plaintiffs' Ex. 9, ¶ 10.

The Purchase Agreement could be terminated by Columbia Sussex or PCI upon written notice anytime prior to the closing date or later, by mutual agreement of the parties, by reason of failure of a condition precedent under ¶ 4(j) of the Purchase Agreement, provided that such failure did not result from the terminating party materially breaching any covenant contained in the Purchase Agreement. Defendants' Ex. 2, ¶ 16(a); Plaintiffs' Ex. 9, ¶ 16(a). Additionally, PCI could terminate the Purchase Agreement if Columbia Sussex failed to perform any material obligation required by the Purchase Agreement not performed prior to or at closing if the failure continued for 20 business days after written notice from PCI to Columbia Sussex. Defendants' Ex. 2, ¶ 16(c); Plaintiffs' Ex. 9, ¶ 16(c).

Columbia Sussex purchased the Cherrick Lot, which was the primary lot used by the Admiral Casinos' patrons. Debtors' Statement of Undisputed Facts, p. 21, ¶ 83; Defendants' Statement of Uncontroverted Material Facts, p. 25, ¶ 119. Likewise, Bill Yung (hereinafter "Yung"), owner of Columbia Sussex, submitted a Level 1[1] gaming license application to MGC. Defendants' Statement of Uncontroverted Material Facts, p. 6, ¶ 24; Debtors' Statement of Undisputed Facts, p. 8, ¶ 25. After findings were presented to MGC commissioners in a closed session, MGC commissioners expressed the following concerns regarding Yung's suitability for licensure: (1)

---

[1] An occupational level I license is required for all individual and key person applicants, which includes officers, directors, managers, and owners of excursion gambling boats or business entity key persons. 11 CSR 45-4.400 (2) (Mo.)

-3-

Yung's Internal Revenue Service (IRS) issues regarding bad record keeping; (2) Yung's questionable tax shelters and residency in Florida; and (3) Yung's association with one of his minority shareholder's sons who allegedly committed the felony of drunk driving. Defendants' Statement of Uncontroverted Material Facts, p. 9-10, ¶¶ 46-50; Debtors' Statement of Undisputed Facts, p. 10, ¶ 34. After meeting with MGC staff and counsel to discuss these concerns, Yung provided additional information and documentation to dispel these concerns. Defendants' Statement of Uncontroverted Material Facts, p. 14, ¶¶ 71, 76; Debtors' Statement of Undisputed Facts, p. 11, ¶ 37. After several attempts to address the MGC's concerns, Yung withdrew the gaming license application on October 24, 2005. Defendants' Statement of Uncontroverted Material Facts, p. 21, ¶ 103.

PCI sent Columbia Sussex a letter dated October 17, 2005, warning that withdrawal of their gaming license application constituted a breach under the Purchase Agreement. Debtors' Statement of Undisputed Facts, p. 14, ¶ 54; Defendants' Statement of Uncontroverted Material Facts, p. 26, ¶ 129. Columbia Sussex responded on October 24, 2005, stating that unilateral withdrawal of the gaming application represented a failure of condition to purchase PRC-MO and not a breach of contract because efforts to obtain a license were futile. Debtors' Statement of Undisputed Facts, p. 15, ¶ 55. Columbia Sussex further stated that a denial of the gaming application in Missouri could affect their operations in other states. Debtors' Statement of Undisputed Facts, p. 15, ¶ 57; Yung Dep. 116:15-16, 169:7-9, September 15, 2006. Columbia Sussex requested return of the deposit.

Columbia Sussex later admitted that it was incorrect in suggesting that denial of the gaming application in Missouri would put its operations in all other states in jeopardy. Yung Dep. 132-137, September 15, 2006. Kelly Duncan, Columbia Sussex's Louisiana Gaming Counsel, only advised that a finding of unsuitability could be grounds for revocation in Louisiana, and that it was unclear whether the Louisiana statute would be applicable to these facts. Duncan further advised that

revocation of a license rarely occurs but it did merit further discussion. Plaintiffs' Ex. 35, ¶ 4.

On October 26, 2005, Columbia Sussex sent a letter (hereinafter "Letter Agreement") to PCI expressing its willingness to resolve all issues between the parties related to the Purchase Agreement and all related matters. Debtors' Statement of Undisputed Facts, p. 30, ¶ 133. Additionally, the letter stated that all discussions should remain confidential and should not be used in any judicial, administrative or other proceeding. The letter was signed by legal counsel for Columbia Sussex.

As a result of PCI's threat to sue Columbia Sussex for breach of the Purchase Agreement, Columbia Sussex increased the validation rates on the Cherrick Lot, from $1.50 per car to $6.00 per car effective December 17, 2005, by letter dated December 16, 2005. Yung Dep. 222: 1-25, September 15, 2006, Plaintiffs' Ex. 53, ¶ 2. Then, Columbia Sussex increased validation rates once more from $6.00 to $10.00 and up to $25.00 for special event parking effective December 25, 2005, by letter dated December 22, 2005. Plaintiffs' Ex. 54, Yung Dep. 226:6-9, September 15, 2006. When PCI refused to pay higher validation rates, Columbia Sussex discontinued validation.

Consequently, Debtors' patrons were forced to park in locations farther from the Admiral Casino that were less safe. Debtors' Statement of Undisputed Facts, p. 26, ¶¶ 112-113. Debtors responded by providing valet and shuttle service for their patrons. Debtors' Statement of Undisputed Facts, p. 26, ¶ 115. From December 16 to 30, 2005, Defendants invoiced Debtors in the amount of $135,674.00 for parking validations at the higher rates. Debtors paid this amount pursuant to this Court's Temporary Restraining Order (hereinafter "TRO") and prior to entry of the preliminary injunction order, without prejudice to Debtors' claim to recoup any portion later found to be excessive. Debtors would have only owed $25,425.00 for this period under the $1.50 per car validation rate. Debtors also did not previously pay an invoice in the amount of $23,220.00 at the higher validation rate for December 29 and 30, 2005. Under the $1.50 per car validation rate, Debtors would have owed $3,483.00 for December 29 and 30, 2005, and this amount would need

to be reduced from the amount of damages claimed by Debtors.  Debtors seek damages in the amount of $106,766.00 for excessive validation rates from December 16 to 30, 2005.  This amount is calculated by taking the $135,674.00 paid, reducing it by $25,425.00, which is the amount owed under the $1.50 per car validation rate and further reducing it by $3,483.00, which is the amount owed for the December 29 and 30 invoice under the $1.50 per car validation rate.  Debtors' Statement of Undisputed Facts, p. 29, ¶¶ 126-129. Debtors also seek damages from December 31, 2005 to February 10, 2006, in the amount of $276,118.00 for additional costs associated with providing valet, shuttle services and substitute parking arrangements.  Debtors' Statement of Undisputed Facts, p. 29, ¶ 130. Debtors suffered damages from December 16, 2005 to February 10, 2006, in the amount of $382,884.00, for fees associated with the loss of the use of the Cherrick Lot, explained above.  Debtors' Statement of Undisputed Facts, p. 29, ¶¶ 126-130.

PCI, PRC-MO and the Official Unsecured Creditors' Committee (hereinafter collectively "Debtors") filed this Adversary on January 12, 2006 against Columbia Sussex Corporation and Wimar Tahoe Corporation (hereinafter collectively "Defendants").  Debtors filed a three count Complaint, Count I for breach of contract, alleging breach of the Purchase Agreement, Count II alleging prima facie tort claim for Columbia Sussex increasing parking validation rates and Count III for injunctive relief.  On January 25, 2006, the Court entered a TRO.  On February 16, 2006, the Court entered an order granting Debtors' request for a preliminary injunction.  Defendants filed an Answer and Counterclaims.  On March 22, 2006, Defendants' Counterclaims are in five counts, Count I for breach of contract, alleging breach of the Purchase Agreement, Count II for breach of contract, alleging breach of the Letter Agreement regarding confidentiality of settlement discussions, Count III for unjust enrichment and restitution from December 16 to 30, 2005, Count IV for suit on account and Count V for unjust enrichment and restitution from February 10, 2006 through the present, regarding the lower validation rates at the Cherrick Lot.  Both Debtors and Defendants have moved for Summary Judgment.

**Debtors' Breach of Contract Claim**

Debtors argue that summary judgment in its favor is appropriate on this Count because the evidence related to Debtors' claims is undisputed and identical to evidence that would be submitted at trial. Debtors argue that Debtors had a valid enforceable contract with established rights and obligations of the parties and Columbia Sussex breached the express obligation not to take any action that would impede or delay MGC from ruling on the gaming application, by withdrawal of the gaming application. Debtors further argue that Columbia Sussex cannot terminate the contract for failure of condition precedent since Columbia Sussex's actions prevented that condition from occurring, Columbia Sussex's actions were not commercially reasonable, and Debtors have been damaged by Columbia Sussex's breach.

Defendants argue that Debtors cannot prove that MGC would have rejected the MGC staff's recommendation of unsuitability and issued the license, therefore, Debtors cannot prove the element of causation. Defendants contend that Debtors must show that but for Columbia Sussex's withdrawal of the gaming application, MGC would have issued a license. Defendants further argue that Debtors cannot show damages without proof that MGC would have issued a license.

**Debtors' Tort Claim**

Debtors charge that Defendants were aware that the Cherrick Lot parking was critical to Debtors' business and increased the rates to punish Debtors for pursuing a breach of contract action against Defendants. Debtors claim that Columbia Sussex committed a prima facie tort by substantially increasing the validation rates on the Cherrick Lot. Defendants argue that Debtors have no evidence to support the tort claim because Debtors cannot establish actual malice or lack of justification for increasing validation rates.

Debtors contend that although Debtors were ordered to pay increased validations during the period between December 16, 2005 and December 30, 2005, the Order was without prejudice to Debtors' right to recoup the difference between those amounts and the $1.50 per car validation

rate that Debtors claim should have been charged. Further, Debtors argue that they are entitled to recoup not only the increased validation payments, but all of the costs associated with Debtors providing alternate parking, valet services, and shuttles for their patrons after Defendants discontinued parking validations for Debtors' patrons.

**Defendants' Counterclaim for Breach of Purchase Agreement**

Defendants argue that Debtors have breached the Purchase Agreement because Debtors have failed to return Columbia Sussex's deposit despite request for return. Debtors argue that Defendants are not entitled to return of the deposit because according to the Purchase Agreement, the deposit may only be returned due to failure of a condition precedent, receipt of gaming license, not caused by a material breach on the part of Defendants. Debtors further argue that Defendants forfeited the deposit because Defendants materially breached the Purchase Agreement by withdrawing the gaming application.

**Defendants' Counterclaim for Breach of Confidentiality Agreement**

Defendants allege that Debtors are liable for breach of a confidentiality agreement contained in the Letter Agreement because Debtors disclosed information discussed in settlement discussions. Debtors argue that Defendants cannot prevail on this counterclaim for breach of a confidentiality agreement because the Letter Agreement violates the Statute of Frauds and Defendants waived its right to pursue this cause of action and are estopped from pursuing money damages because

Defendants did not object to evidence of settlement discussion at the hearing on the temporary restraining order and attempted to use such evidence themselves.

**Defendants' Counterclaim for Unjust Enrichment and Restitution from December 16 to 30, 2005, Defendants' Counterclaim for Suit on Account and Defendants' Counterclaim for Unjust Enrichment and Restitution from February 10, 2006 through the present**

Defendants allege that Debtors have been unjustly enriched because Debtors failed to pay increased validations rates for the use of the Cherrick Lot. Defendants allege that they should

-8-

receive restitution for increased validation rates. Debtors argue that Debtors have not been unjustly enriched and do not owe any additional monies to Defendants for increased parking validation rates.

## JURISDICTION AND VENUE

This Court has jurisdiction of this matter pursuant 28 U.S.C. §§ 151, 157 and 1334 (2006) and Local Rule 81-9.01 (B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. §157(b) (2) (A) (2007). Venue is proper in this District under 28 U.S.C. §1409(a) (2006).

## CONCLUSIONS OF LAW

The main issue before the Court is whether summary judgment is appropriate under the facts of this case. "A motion for summary judgment proceeds under Rule 56 of the Federal Rules of Civil Procedure, made applicable in Bankruptcy proceedings by Rule 7056." *In re Gardner*, 220 B.R. 63, 64 (Bankr. E.D. Mo. 1998). "A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may…move with or without supporting affidavits for a summary judgment in the party's favor…" FED. R. BANKR. P. 7056(a) (2006).

"The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law." FED. R. BANKR. P. 7056(c) (2006). The movant must demonstrate that the record does not disclose a genuine dispute of a material fact and identify that portion of the record bearing that assertion. *City of Mount Pleasant v. Associated Elec. Coop., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988).

"When a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Libby Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 212-13 (1986). A court must view the evidence presented in a light most favorable to the non-moving party and the non-moving party must be given the benefit of any inferences reasonably drawn from such evidence. *Matsushita Elec. Ind.*

-9-

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 547, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 553 (1986); *Alpine Elec. Co. v. Union Bank*, 979 F.2d 133, 135 (8th Cir. 1992).

"The movant can meet its burden for summary judgment by showing that little or no evidence may be found to support the non-movant's case." See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265, 275 (1986). "Once a movant has determined that no material facts are in dispute, the non-movant must set forth facts indicating a genuine issue for trial exists in order to avoid granting of summary judgment." See *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2nd Cir. 1996) (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2nd Cir. 1990)).

**Debtors' Breach of Contract Claim**

The issue before the Court is whether withdrawal of Columbia Sussex's gaming application constitutes a breach of the Purchase Agreement. A party may bring a cause of action for breach if: (1) there is a valid contract between the parties; (2) each party has rights and obligations under the contract; (3) there is a breach by defendant; and (4) plaintiff suffered damages. *Gilomen v. Southwest Missouri Truck Center, Inc.*, 737 S.W.2d 499 (Mo. Ct. App. 1987) (citing *U.S. Suzuki Motor Corp. v. Johnson*, 637 S.W.2d 105, 106 (Mo. Ct. App. 1984); *Johnson v. Great Heritage Life Insurance Co.*, 490 S.W.2d 686, 691 (Mo. Ct. App. 1973).

Here, the parties agree that there was a valid agreement in place with rights and obligations assigned to each party. Debtors have incurred damages. However, there was not a breach of the Purchase Agreement due to a failure of a condition precedent recited in the Purchase Agreement. A condition precedent is a condition that must be satisfied before the duty to perform under an existing contract arises. *Jetz Service Co. v. Botros*, 91 S.W.3d 157, 163 (Mo. Ct. App. 2002). Here, the Purchase Agreement stated that Columbia Sussex would complete the sale only after receiving approval of its application for a gaming license from MGC. Columbia Sussex withdrew the gaming application prior to a decision by MGC.

Under the Purchase Agreement, Columbia Sussex agreed not to take any action that would

impede or delay approval by MGC. In order for Debtors to recover for breach, Debtors must not only show damages, but Debtors must also prove that but for Columbia Sussex's act of withdrawing the gaming license application, that Debtors would not have suffered damage. MGC would most likely have denied the application. Thus, Debtors cannot prove that the gaming license application would have been approved over the MGC staff's recommendation of unsuitability.

The remaining issue is whether Defendants are entitled to judgment as a matter of law under this Count. Columbia Sussex's withdrawal did not impede or delay approval by MGC because MGC staff made it clear to Columbia Sussex that MGC staff would make a recommendation of unsuitability for licensing. Debtors argue that MGC could have rejected MGC staff recommendation and granted the license. Expert deposition testimony demonstrates that MGC is an independent body that can make a decision independent of the staff's recommendation. Thomas Dep. 63: 16-18, February 2, 2007; Johnson Dep. 165: 19-25, January 12, 2007. However, Debtors did not present any evidence or testimony in this instance to prove that MGC would have rejected the staff recommendation and approved the license. Based on the past decisions of MGC discussed during expert deposition testimony, MGC almost never rejects MGC staff recommendations. Campbell Dep. 62: 21-25, February 2, 2007.

Therefore, Debtors cannot prove that but for Columbia Sussex's withdrawal, the gaming application would have been approved. The fact that Debtors were forced to sell at a lower sale price is not enough to prove that Debtors were damaged by Columbia Sussex's act of withdrawing the gaming application. Thus, Defendants have met their burden in establishing that there is no genuine issue of material fact that withdrawal of the gaming application did not breach the Purchase Agreement.

Even if Columbia Sussex's failure to complete the purchase could have been considered a breach, Columbia Sussex has successfully argued that without the gaming license, the purpose of the Purchase Agreement has been frustrated because Columbia Sussex would not be able to

-11-

operate the casino without a license from MGC. Frustration of purpose will excuse contract performance when the purpose of the contract is frustrated by the occurrence or non-occurrence of an event on which the contract was based. *Pieper Inc. v. Land O' Lakes Farmland Feed LLC*, 390 F.3d 1062, 1065 (8th Cir. 2004). Therefore, the purpose of the Purchase Agreement was frustrated and Columbia Sussex would have been discharged from its duties under the Purchase Agreement to purchase all of the stock of PRC-MO from PCI.

Furthermore, there is a causation issue in this matter that must be addressed. When a regulatory body has discretion to approve or disapprove an application for a license, absent evidence of a party's ability to obtain a license to operate, any damages asserted by another party due to failure to apply for that license would be inherently speculative. *City of St. Louis v. Riverside Waste Management, LLC*, 73 S.W.3d 794 (Mo. Ct. App. 2002) (Court held plaintiff is not entitled to award of damages because it could not prove that it would have received a permit to expand the landfill). Thus, this Court finds Defendants did not breach the Purchase Agreement and Defendants are entitled to summary judgment on Count I of the Complaint.

**Debtors' Tort Claim**

The issue is whether Columbia Sussex increasing validation rates to prevent Debtors from bringing an action for breach of the Purchase Agreement gives rise to a prima facie tort claim. In order to recover in tort, there must be (1) an intentional lawful act, (2) intent to cause injury to plaintiff, (3) injury to plaintiff, and (4) an absence of justification or an insufficient justification for the act. *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo. Ct. App. 1980). Here, since Columbia Sussex owned the Cherrick Lot, Columbia Sussex had a legal right to increase prices. However, Columbia Sussex was aware that the Cherrick Lot was the primary lot for Debtors' patrons. Further, Columbia Sussex knew that Debtors' business would suffer if Debtors did not have access to the Cherrick Lot.

Defendants gave two reasons for increasing the validation rates: (1) to increase profits and (2) to gain leverage against Debtors to prevent them from bringing suit for breach of the Purchase Agreement. Yung Dep. 223: 4-18, September 15, 2006; Debtors' Statement of Undisputed Facts, p. 23, ¶ 94. Since profits have actually decreased since validation rates were raised and the volume of cars parking on the Cherrick Lot has decreased (Debtors' Statement of Undisputed Facts, p. 24, ¶ 98), the Court finds the latter to be the primary reason for the price increase. Thus, Defendants have demonstrated an intent to injure Debtors.

Debtors were forced to initially pay higher rates, find less safe alternative parking, and provide expensive valet and shuttle services to keep its patrons. As a result, injury to Debtors is established. Defendants provided insufficient justification for increasing validation rates because instead of realizing a larger profit, increasing rates caused Defendants to lose money and drove many of the former patrons away.

Defendants' assertion that rates were raised to receive a better return on the investment is not reasonable in light of the fact that Defendants actually made less of a profit upon increasing the validation rates. After Defendants increased the validation rates, a smaller number of cars parked in the Cherrick Lot. Yung Dep. 236: 3-7, September 15, 2006; Debtors' Statement of Undisputed Facts, p. 24, ¶ 98. The higher rates at the Cherrick Lot appeared to drive patrons to cheaper lots that are inconvenient and unsafe. Defendants admitted that it increased rates to have leverage to use against Debtors to persuade Debtors not to bring a breach of contract action. Thus, Debtors can prove actual malice on the part of Defendants. Likewise, Debtors can prove lack of justification since the valid business reason offered by Defendants fails due to decrease in profit after the fee increase. Therefore, Debtors have adequately proven their tort claim. The facts establish the elements of prima facie tort, such that Debtors are entitled to summary judgment as to Count II of the Complaint.

**Defendants' Counterclaim for Breach of Purchase Agreement**

The issue is whether Debtors breached the Purchase Agreement by refusing to return Defendants' deposit made in conjunction with the Purchase Agreement. The Purchase Agreement clearly stated in ¶ 16(f) that Columbia Sussex may terminate the Purchase Agreement upon written notice to PCI if any conditions of ¶ 4 could not be met. Here, Defendants were unable to obtain a gaming license. Thus, there was a failure of a condition precedent excusing Defendants from the purchase of the President Casino. Defendants sent a letter to Debtors explaining that MGC refused to issue the necessary gaming license and requested return of the deposit. There is no genuine issue of material fact that Defendants were most likely not going to be approved for a gaming license by MGC and therefore the purchase could not be completed. Defendants requested return of the deposit in writing as required by the Purchase Agreement. Since, Defendant was unable to obtain the gaming license required to complete the purchase of the Admiral Casino, Defendants are entitled to return of the deposit. Therefore, Defendants are entitled to summary judgment on Count I of the Counterclaims.

**Defendants' Counterclaim for Breach of Confidentiality Agreement**

The issue is whether Debtors' disclosure of settlement discussion amounts to a breach of contract action based on Defendants' Letter Agreement requesting that settlement discussions be kept confidential by all parties. A breach of contract action is not actionable where it is barred by the Statute of Frauds or where the facts give rise to a waiver situation.

Debtors assert that Defendants claim for monetary damage is barred by the Statute of Frauds. Moreover, Debtors contend that Debtors cannot be bound by its terms. An agreement must be signed by the party to be charged. "An agreement that by its own terms is not to be performed within one year from the making is void unless in writing." *Holloway v. King*, 361 F.Supp.2d 351, 357-58 (S.D. N.Y. 2005).

Here, the alleged agreement not to disclose settlement discussions could not be performed

-14-

within one year, because the information may be disclosed at anytime.  Thus, Defendants cannot assert that in addition to the writing that there was an oral agreement.  Moreover, Debtors received the letter of confidentiality by mail and Debtors never signed the letter.  Therefore, Debtors cannot be bound by this communication and did not breach the Letter Agreement.

Additionally, even if the Letter Agreement did not violate the Statues of Fraud, Defendants waived its breach of contract claim and is estopped from pursuing money damages because Defendants did not object to introduction of this evidence at the TRO hearing and Defendants attempted to introduce information from the settlement discussions during the preliminary injunction hearing.  Thus, even if Debtors were found to have breached the Letter Agreement, Defendants waived the right to take action by attempting to disclose settlement discussion information.  "A waiver is a relinquishment of a known right." *Investors Title Co. v. Chicago Title Ins. Co.*, 983 S.W.2d 533, 537 (Mo. Ct. App. 1999).  Here, Defendants gave up any right it may have had by attempting to disclose themselves.  In this instance, it would be inherently unfair to allow Defendants to use the information in violation of the alleged Letter Agreement, while punishing the Debtors for the same act.  Finally, although Defendants have brought a breach of contract claim forward, Defendants' owner was unaware of any breach of confidentiality on the part of the Debtors.  Yung Dep. 23:17-25, 26:3-13, September 15, 2006; Debtors' Statement of Undisputed Facts, p. 31-32, ¶ 135-137.  Therefore, this claim is without merit.  Therefore, Debtors are entitled to summary judgment on Counterclaim II in that Debtors did not breach the confidentiality agreement, in that there was no agreement.

**Defendants' Counterclaim for Unjust Enrichment and Restitution from December 16 to 30, 2005, Defendants' Counterclaim for Suit on Account and Defendants' Counterclaim for Unjust Enrichment and Restitution from February 10, 2006 through the present**

The issues before the Court are whether Debtors were unjustly enriched when Debtors used the Cherrick Lot without paying increased validation rates and whether Defendants are entitled to restitution for the increased rates.  Unjust enrichment is a legal fiction used as a means of recovery

when there is no express contract between parties. *United States v. Applied Pharm. Consultants, Inc.*, 182 F.3d 603, 606 (8th Cir. 1999). The theory of unjust enrichment is that one party has money or some thing of value that belongs to another party allowing restitution to be granted to the aggrieved party by a court. *Id.* at 606. Here, Defendants argue that Debtors should pay restitution for using the Cherrick Lot while paying less than the increased validation rate. However, Debtors' success in proving their prima facie tort claim against Defendants proves not only that Debtors were not unjustly enriched, but that Defendants' validation rates should not have been increased. Thus, Defendants are not entitled to receive restitution from Debtors. Therefore, Debtors are entitled to summary judgment as to Counterclaims III, IV and V in that there was no unjust enrichment to Debtors in paying the lower validation rate.

      By separate order Debtors' Motion for Summary Judgment will be granted as to Count II of Debtors' Complaint and as to Counterclaims II, III, IV and V; and Defendants' Motion for Summary Judgment will be granted as to Count I of Debtors' Complaint and as to Counterclaim I.

                                                              KATHY A. SURRATT-STATES
                                                              United States Bankruptcy Judge

DATED: December 27, 2007
St. Louis, Missouri

Copies to:

Office of the United States Trustee
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Suite 6.353
St. Louis, MO  63102

Brian Wade Hockett
Thompson Coburn LLP
One US Bank Plaza
St. Louis, MO 63101

Brian C. Walsh
Bryan Cave LLP
211 N. Broadway, Suite 3600
St. Louis, MO 63102

Columbia Sussex Corporation
207 Grandview Drive
Ft. Mitchell, KY 41017-2799

President Casinos, Inc.
1000 North Leonor K Sullivan Blvd.
Saint Louis, MO 63102

Mark V. Bossi
Thompson Coburn
One US Bank Plaza
St. Louis, MO 63101

Gerard T. Carmody
Carmody MacDonald P.C.
120 S. Central Avenue, Suite 1800
St. Louis, MO 63105-1705

Wimar Tahoe Corporation
207 Grandview Drive
Ft Mitchell, KY 41017